Case number 22-1312 et al. GHG Management LLC doing business as Windy City Cannabis, doing business as Curaleaf-Weed Street Petitioner versus National Labor Relations Board. Mr. Baskin for the petitioner, Mr. Sautter for the respondent. Good morning, counsel. Mr. Baskin, please proceed when you're ready. Morning. Maurice Baskin appearing on behalf of Curaleaf-Weed Street. I've asked to save time for rebuttal of the company petition for review of the National Labor Relations Board's certification of a union election by a one-vote margin. And it was an election plagued by multiple ballot handling irregularities committed by the Chicago region of the board handling the election. This case really on appeal boils down to what is the standard that the board should have used to in the national hot rod case found the correct standard is clear. That's the quote from the panel in voter ballot handling cases of the board. And the clear standard is if the board itself causes an irregularity and the number of voters possibly disenfranchised, possibly disenfranchised affect the outcome of an election, no certification of the result is appropriate. The court quoted from same cases that we quoted from in filing the request for review, that's the Garda case in the Wolverine dispatch case, both of which dealt with ballot handling. That is the most sacrosanct part of the election process. That's why the standard is possible disenfranchisement, not the standard that the board applied in this case. This court has failed to follow it and don't overrule it. They just ignore it. And in a case on a very, very similar facts, they ignored the policy. They ignored their own policy. They applied a case called guards, which has nothing to do with ballot handling. It has to do with a pre-election. The employer wanted to do a pre-election speech and they didn't give him the right time. Totally different scenario. Mr. Baskin, I'm going to take a minute of your time because I want to just set out my version of what happened is correct. All right. On the side of the voters, and that's Ms. Ratton in this case, on March 4th, which was the last day, according to the notice, that if you didn't get a ballot, I'm going to take this off, I can hear myself. That if you didn't get a ballot, you had to request. All right. Even the board in its footnote four says at the beginning of March, she requested that duplicate ballot. She actually had done more than that. She'd called twice. She hadn't left voice messages. She'd even asked for the cell number of the board agent. She was that intent on getting her vote in. So on the fourth, at least it's clear from my reading of the record that she makes the request. It then takes the board six days to mail it. She gets it on the 15th. She has a conversation with the board agent, and she tells that board agent, I'm sending it in today. That's to me the most important fact in the whole case, or one of them. Anyway, and so she waits until the next day, or until the 18th. Now, there was no reason for her to think that it would take more than five days for it to get there because it took the ballot five days for it to get to her. It takes triple that time, 15 days, one day after the election. That's her side of it. Then you look at what the board agent did in this Happy Monday email, and she says, and this is on the 22nd of March, and she says to the parties, we've received ballots from all at least that have told me they've sent their ballots in. That is not true with respect to Ms. Rett, who told her on the 15th, or the 16th, I'm sending it in today. She actually sent it in on the 18th. But then she goes on this board agent to say, thus, we'll be going forward. In other words, completely leaving one person in this determinative one vote election out of the equation. Then when the vote is taken, and it's 11 to 10, the next day they get Ms. Ratton's ballot. And I believe the company had asked for, after the count, the employer's representative emailed and said, please preserve any late arriving ballot envelopes. Okay, so they get Ms. Ratton, who had sent it three weeks before. Now the board agent says, well, I'd like to correct what happened. Then she says, the three voters' ballots that were received on Friday, March 19th, that at that point, they had then received a ballot from each voter that had contacted her. That is not true either, because Ms. Ratton doesn't get counted until, or doesn't get counted at all, but doesn't get received until the day after the election. And then the board agent goes on to say, I'd like to correct what I said way back. And I don't see how that's relevant. In other words, when she says, well, what I meant was I'd received ballots of the people who had me to confirm that I got the ballots. And to me, that is irrelevant. If there's nothing in the record, that board agent would have followed up if she hadn't gotten, which she did not get. She never got the ballot from Ms. Ratton. So the fact that she tries, the board agent tries to say, well, what I meant was I got it from everybody who asked me to confirm. That's not relevant unless when she didn't get it, she kept a tally and called and said, Ms. Ratton, I haven't gotten your ballot yet. And then when you look at HopRod, that it's only the possibility. Here, there was disenfranchisement of the one voter that made a difference. I'm finished. Well, you have, you have stated accurately the facts of this case. I can't exterminate a discussion of those facts. And I would just say what you've highlighted in that recitation is the multiple irregularities that the board was, for which the board was responsible. The six-day delay in sending the replacement ballot, National Hot Rod was only a five-day. So it's worse here. Extending the balloting when it appeared that ballots were delayed and then misrepresenting whatever word you want to use. Statement was false that she made twice, by the way, in her emails to the parties, that she said she had not, you know, that all the ballots had been received from people who had contacted her. That was simply false. And her attempt to clarify is not a clarification at all. And, and frankly is simply irrelevant. Beyond that, they knew the mails were running slowly and did nothing more to prevent further disenfranchisement. Even a one-day movement would have prevented disenfranchisement here. So the test is, was there a possibility of disenfranchisement caused by the board irregularities? This is a slam dunk case. The only way they avoided that was to ignore their own tests and to say, well, you have to show actual prejudice. Although actually we did to say you had to show beyond a reasonable doubt. We actually have that too, but we should not be there. This case stops with their failure to, and they don't acknowledge guard, a Wolverine, let alone national IRA. They just move on and say, well, let's apply this guard smart case, which has nothing to do with facts here. Um, in order to prevail, you don't need to show, and I don't understand you to be saying that the board representative who sent those communications was acting in any bad faith. No, I was intentionally misrepresenting something. Your point is that it just turns out to have given an incorrect impression. Well, everything had been received when, in fact, there were some, you know, the board said it was confusing. I think it's more than that. Maybe more than an incorrect impression, but it is not. I mean, it's a flat out statement that something happened that did not happen, and he knew it. Does she knew it? Uh, so, but it is not necessary to our case. It's an irregularity. That's the standard. And did it have the possible effect of disenfranchising employee? Uh, and a one vote election critical one vote. Not that she was the only vote that was not counted because there was another witness who testified that she had cement ballot and was never received. But, you know, we're focusing on this with particular voter. But mail delays were another aspect of our request for case against the board finding and certifying this election. So I'll reserve the rest of my time for rebuttal. Unless you have one further question. Yes. Do we know how far away Miss Bratton lived? I mean, this is in Chicago, and it isn't as if this may not be in the record. Isn't it as if that ballot had to travel clear across the country? No, it did not say that she was definitely in the Chicago area. I don't have her address, but it was definitely within reason for her to think that her ballot would get there on time. And if the board had not delayed in sending ballot to her, it would have. I mean, almost certainly, which is again, not the standard. It's whether it possibly would have. It's not whether it was like in the record. I mean, I'm not sure how much this matters, but just to be fair to the record, there's also indications in the record that she could have acted more quickly. And that she actually got that board representative reached out, and she may well have been legitimately very busy, but that there wasn't an effort made to reconnect with the board when they attended. And of course, the board agent was not allowed to testify, which under normal circumstances would create an adverse inference against such a witness and the party who's not letting the witness testify. So you don't really have the record from the board agent's side. And whose fault? So, but go back to your question. It's just another irregularity in this whole process that resulted in the disenfranchisement of the dispositive voter. And under the tests that must apply that your fellow panel has applied in this very, very similar situation, the enforcement action should be denied and the petition should be granted. Did you try to call the board? Excuse me? As a witness? Sorry? Did you try to call? Yes, and it's in our brief. It's in each level that we had asked the board agent. It's a request for review, and they denied contrary to their own precedent. There was really never a solid reason given as to why they wouldn't allow the board agent to testify. We infer it's because the board agent had things to say that would not have helped their case. Thank you. Thank you, counsel. Mr. Sauter, we'll open the board now. Good morning, your honors. Greg Sauter for the National Labor Relations Board. May it please the court. I think it's very important to start by laying out the standards for these, the two objections, in this case, objection one and objection two, because it doesn't stop the way Mr. Baskin says with this possibility of disenfranchisement. When you have a situation where an objection concerns the board's standards and processes, you start with that, but then you go on. You have to prove that there was an actual possibility of disenfranchisement, and to do that, you apply the Lemko test. And the Lemko test asks whether, under an objective standard, the employees were given adequate notice of the election and an opportunity to vote, and or were they prevented from voting by conduct of one of the parties or by an unfairness in the scheduling or the mechanics of the election. So that is the full standard for objection one. It does not stop with the possibility. And what is fair about the mechanics of the election when the board agent said, I've got all the ballots back that they told me they'd sent, and knowing in Ms. Rask, she didn't have Ms. Rask? Well, now we're getting to the second objection, and that one has its own standard, which is the standard under guardsmen. And the question there is whether the agent's conduct raised a reasonable doubt as to the fairness and validity of the election. I have to say, in reading your brief, I wasn't entirely clear on how we're supposed to know which standard applies in which context. I take it that the premise of your brief—let me just ask this question at the outset—the premise of your brief is that the case might be different if the possible disenfranchisement standard applied to objection two. No, I'm—well, are the— Well, let me ask you this. You think that the possible disenfranchisement standard—is that—are you calling it LEMCO? Yes. Okay. Well, it's GARDA, but then you apply LEMCO after that. Okay. So the GARDA-LEMCO complex, that does not apply to objection two. No, because objection two deals with agent misconduct. Right. So I'm just—no, just to get the premise right, you're saying that the LEMCO-GARDA framework does not apply to objection two. That's right. So that must mean that if the LEMCO-GARDA framework did apply to objection two, the result might have been different. Otherwise, we wouldn't care if it didn't apply. So you must—the premise of your argument has to be, I think, that had the other standard—should the other standard have applied here, the result might have been different. Otherwise, I assume you would have made the argument that it doesn't matter which standard applies. You didn't make that argument. So I'm— I think it's—I think it's different, Your Honor. The question is not—the question is which—what conduct—what is the issue we're dealing with? Is it an irregularity, something that where it was not misconduct, but it didn't maybe follow the way the rules should have been? In this case, perhaps the agent could have been more diligent in sending the ballot out, or is it outright misconduct? If it's outright misconduct, then what you're looking at is not the disenfranchisement of a single employee, but does it put in question the overall fairness of the election? But how is the election not—it necessarily puts into question the outright fairness of the election, if the result might have been different. Yes, Your Honor. But then— whether the board acted correctly or not. And what you focus on is the facts as we know them here. The fact that there were some delays attributable to Mrs. Ratten, there were some delays attributable to the board, but ultimately, the buck stops on March 15th when Ms. Ratten has her ballot in hand. At that point, does she have an adequate opportunity to vote? That's the question. And at that point, she has, as Judge Henderson noted, she has 16 days until the final count. So—and it's true her ballot doesn't make it there, but that's not because of the board's doing. The board doesn't control the post office. The board doesn't control when Ms. Ratten sends her ballot. Now, I know where you're going. But it does control whether there's going to be a delay in the counting. And yes, on March 18th, whenever she sent it, she has had an opportunity to vote. But because of the board's irregular—irregularity, her vote does not count. Now when you're talking about irregularity, you're talking about the lack of postponement. The second one. Because you said she had an opportunity to vote on the 15th. Well, because she mailed it in. Nobody stopped her from doing that. But then, when the board agents said, I've got all the ballots of the people who told me they would send them, thus we can go ahead. We don't need an extension. Knowing that Ms. Ratten, and I'm not talking about misconduct, I'm just talking about incompetence, uh, that knowing that Ms. Ratten told her I'm sending mine in and knowing that she didn't have it yet. Right. So, Judge Henderson, I'm taking— Let me ask you, you don't think that's an irregularity? That's why, Your Honor, that's why the board analyzed that as misconduct by the agent. So clearly it was. But now I'm going to go back. But not an irregularity? No, an irregularity would be the delay, for example, that the board agent had in sending these ballots. These words. I'm sorry? That one of those is irregularity and not misconduct. It's just, they all start to just come together. It's really hard to know. I don't understand why that's not an irregularity. It seems like it's an irregularity when there's misconduct. Well, and that's the, that's the, that's honestly the one of the more confusing parts of this case is that it involves the same person, Ms. Ratten, and the same board agent for those two objections. But this court has long recognized— And the idea that you'd apply different standards to those two objections just seems odd to me because they're basically talking about the same thing. And at the end of the day, the question in the case is, can we trust this election? Should something have happened differently given the way this came about? And then to have this, this esoteric inquiry where we, you know, put one objection in one box and put another objection in another box, and then we're supposed to have some way of distinguishing one from the other would have to be a pretty clean way of distinguishing it. And I'm not sure what that is. And let me look, for example, at page 39 of your brief. So this is, I think, part of the effort to explain how we know which box a particular scenario fits into. And this is at the bottom of the page. The numerous cases cited by the company to support its contentions are unveiling. Unlike Objection 2— And this is where we get to the distinction between Objection 1 and Objection 2. Unlike Objection 2, none of them analyze objections based on alleged misconduct by a board, regional office, or agent. So that's one box is alleged misconduct by a board, regional office, or agent. For instance, some of the cases involve regional offices' failure to timely send ballots. If you ask me, does a regional office's failure to timely send ballots connote misconduct by a board, regional office? Just seems to me, yeah, it does. If a board, regional office fails to timely send a ballot, that sounds like alleged misconduct by a board, regional office, but apparently not. Apparently those are diametrically different, hermetically sealed things, and they just seem like they're the same thing to me. I understand your point, Your Honor. There's two things about that. I'm not sure exactly what the board did in those cases and why it applied that standard. But first, this court has long held in regal cinemas that it will not question the board's application of a particular standard unless, so long as it's reasonably defensible. That's one. Now, we can argue over the meaning of misconduct or irregularity. What the board found in this space, and I think it's certainly reasonably defensible, is that in one objection, the agent waited several days to send the ballot, but ultimately the ballot got there. In another case, she gave wrong information to the parties. And so that, the board found, is not just an irregularity, whatever you want to call it, it is outright misconduct. And therefore, it needs to be analyzed under the misconduct standard. And in that case, now turning, as I was saying earlier to Judge Henderson, so we agree, I hope, or I'm not going to presume, that under objection one, there was no disenfranchisement because Ms. Ratton got her ballot and she still had time to send it back. So we turn to objection two. Now, it's unquestioned that the board agent gave incorrect information to the parties. The question now is, did giving that incorrect information raise a reasonable doubt as to the fairness of the election? So let's look at the fact. Why are we asking in this situation whether there's possible disenfranchisement? Because as we've spoken, the board isn't all seeing, Your Honor, right? Obviously, this is a hindsightist 2020 case. If the board had known that this ballot was going to get there one day late, you know, if the board had known that this ballot would be decided by one vote, everything would be different. But this category is, apparently, this category is about board misconduct, right? Right. So that's stuff that the board knows. No, the board doesn't know if an election is going to be decided by one vote, Your Honor. Nobody knows if it's engaging in misconduct. Well, in this case, right. So there is misconduct, but that's not where the analysis ends. Does that misconduct put in question the fairness of the election? But it does. And if I can continue. No, no, no, you can't because I want to continue my question. It seems like it does necessarily call into question the fairness of the election if the election result might have been wrong. So is an election fair because somebody's ballot didn't get counted in a one because it was a one in a one due to board misconduct due to board misconduct? Right. Or is it fair because or is it unfair because the actions of the board agents showed that there was some kind of it's we're not asking if it's unfair to Miss Ratten. We're asking if it's unfair to if it looks unfair to the people, the people who have the most at employees. Does it look like the board acted in a way that was intended to privilege one party or tilt the election in favor of one party? And to this day, Your Honor, we don't know how Miss Ratten would have voted. Exactly. Yeah, that's exactly what we don't know. Exactly. And the board and the board agent didn't know at that point either. So they were not trying to tilt the election one way or the other. They were not trying to steer this election in a particular way. Well, in fact, Your Honor, this is this is the thing. The decision doesn't turn on that. The decision doesn't turn on an assessment of whether there was a bad faith misconduct or something. Just it doesn't turn on that at all. That would have been one thing. It would have been more, I think, sustainable if the board's decision turned on an assessment of the degree of misconduct. It doesn't turn on that. It assumes misconduct. So I think the way we take this case, let's assume it was all intentional. We just assume it was totally bad faith. And the answer that the board gives is it still doesn't matter because it's still speculative as to whether an extension would have been granted. That's the upshot, right? Well, I would I would I would add something else to that is that. I don't know. I don't know under your hypothetical how it would be possible for it to be intentional unless this person had it in for Miss Ratten. But even then, it would only have mattered if this election. I don't think it was, but I'm just saying that the board analyzes it. It invites the assumption that there was intentional bad faith. Right. And it still doesn't matter. It doesn't matter, your honor. Not in this case, because the the the election. Ultimately, there was no we don't know. Are you saying we should assume bad faith towards Miss Ratten? I think the board did. I think the board said I disagree. I'm sorry. I think I don't think the board assumed it affirmatively in thinking that there was misconduct, bad faith misconduct. I'm saying the board's analysis says that even if there was, there still wouldn't be relief here because it says we assume misconduct, right? We assume misconduct. What we're going to is whether there's actual prejudice. The reason there was an actual prejudice is that we don't know that an extension would have been granted had it been asked for. That would be equally true in a case in which there was affirmative, bad faith misconduct. It would still independently rest on the conclusion that regardless of whether there was misconduct, it's speculative as to whether the extension would have been granted if asked for it. Right. That that is one aspect. But the board makes another finding, your honor, before it gets to the prejudice part, which is did the conduct affect the fairness? Did the conduct affect the fairness of the election? Would somebody looking from the outside think this board agent by her conduct did something that affected the way the mechanics of the election raises suspicion that there was something else going on. And in this case, because the board agent at that time didn't know it would be decided by one vote because we don't know, they didn't know how Ms. Ratten would have voted, that the conclusion of the board is, no, there can't be a doubt as to the fairness of the election because those all of those factors were not there. And let me point out as well, the the the company, neither the company nor they were at the time Ms. Ratten's ballot was still out there. There were eight, seven other voting around. Nobody cared about those ballots. Nobody was jumping up and down to get an extension for those ballots. The only reason we are here today, your honor, is because Ms. Ratten's ballot arrived a day late. And the evidence that it's not unfair, frankly, is in this forum. It's because if the election I'm sorry, it's because if the election had come out the other way, I would still be here. But instead of Mr. Baskin, we'd have the union. Yeah. So it's not a question of, you know, whether the board's conduct affected the the misconduct of the board raised a question as to the board's integrity in the election. It's the question that that is not what happened. I'm sorry, Judge Henderson, I cut you off. Go ahead. I just have one last thing and I I think we need to call this to a halt. So the Hop Rock Rod decision, which is our our precedent, that's what we're bound by, says under the board's standard, and that's of course interpreting your client's standard. Under the board's standard, it is only necessary for a challenger to an election to establish that it was possible for a board irregularity to have caused a different voting result. Is it your position that if we put in instead misconduct so that it would read it's only necessary to establish that it was possible for a board for board misconduct to have caused a different voting result? Oh, that, I mean, I think that that would be. Is that your position? It can't. It's the number. Irregularity as opposed to misconduct. Is that what you're saying? If we just substituted misconduct for irregularity, I mean, that's much worse. I mean, in that case, the board would have applied a different standard in that case, and I don't know what the result would have been. But Hot Rod is, just like Objection 1 in this case, an issue of an agent delaying a ballot being sent out. And this court applied the first step of the board's test, GARDA. It didn't go beyond to LEMCO, but that's not necessary. I mean, but otherwise, this court has recognized the LEMCO standard. That's in Antelope Valley. This court has also recognized the GARDA's Mark Reasonable Doubt standard. That's in Durham schools. So this court knows those standards and how they apply. Am I understanding it right, then, that you think that one standard applies in cases of irregularity, another standard applies in cases of misconduct? That's, yes. And I understand we can discuss, there's some semantic difference about what irregularity may mean, whether irregularity, misconduct falls under irregularity or something like that. Right. I mean, it just seems to me that if that's really what's going on, if these two are all different, we're all assuming they're different. Yes. Which means by different, I mean that then different results could obtain. That's the only difference that matters. Right. So difference is different in a significant way. There has to be some sense, there has to be some coherent framework to understand when one standard applies as opposed to the other. And if it turns on whether we define something as an irregularity on one hand or misconduct on the other hand, when the words irregularity and misconduct seem relatively coterminous to me, at least overlapping. I agree. Pretty confusing to determine which standard applies in what situation. Yes, Your Honor. But, and this is getting back to Cronroyal. The question is, did the board's application of the standards in this case, was it reasonably defensible? Is it reasonably defensible for the board to consider that the agent's act of giving false information to the parties was misconduct, outright misconduct, and to consider that the agent's lack of diligence in sending a ballot to Ms. Ratton was not misconduct, was just negligence? I have one last question, which is on the prejudice prong, because I read the prejudice prong to be doing quite a bit of work from the board's perspective. Yes, yes, absolutely. So on prejudice, the point you make in your brief, and this is at page 35, is that even if the company would have sought an extension, and then even if the union would have agreed to an extension, the regional director didn't have to grant it and might have denied it. And it wouldn't have been an abuse of discretion if the regional director had denied it. And I take the point that the stipulated agreement uses the language of discretion. Of course it does. But in a situation like this, if there's, suppose that we know that hasn't quite come in yet. And then the company says, hey, I want to get an extension because of that. And suppose you have a really good faith union and the union says, yeah, I agree with you. Let's get an extension. There's one ballot that's yet to come in. You think it would be okay for the acting regional director to say, no, I'm calling it today. I know you all agree. I know there's one more vote that's yet to come in. And for all we know, that vote could be the that that could be okay. Yes, your honor. But let me explain. Okay. So it's in the regional director's discretion, right? The regional director at that point has to balance two important interests. The first interest is giving all employees the opportunity to vote the broadest, you know, ability to vote. The second is giving finality to the election, getting a result. We're done now. Okay. And here's the dilemma facing the regional director. In that case, we know there's a ballot that's still out there. By the way, there are seven other ballots still out there, right? Nobody cares about them. We know there's a ballot still out there. It's been, you know, that one's been sent in with the seven other ones. We don't know that, right? Right, right. Okay. We know based on what Ms. Ran said that it was sent in the 16th. She sent it in the 16th. Okay. That is now 15 days, roughly, that this ballot has been in the mail. So is it worth extending the election for, obviously, we don't know it's going to come in the next day, right? Is it worth, am I as regional director, am I making, am I abusing my discretion by saying, you know what? I don't know how this election is going to turn out. I don't want employees to have to wait forever. If it doesn't get in in three days, then are we going to have another extension, another extension after that? You have the union that's representing the employees saying that they're okay with it by hypothesis. So you're already taking into account the employee's interest because the union is saying, I'm fine with this. Let's wait a week. Is that okay with you company? The company says, yeah, let's wait a week and then we'll call it a day. And they both come in and say, we agree. We think we should wait a week. Let's give a week. And in fact, even during that week, maybe the person could just come in and hand deliver a provisional ballot and then we don't have to wait for the mail. And then the regional director could still say no. I think if the union said, you know, we agree, I think it's entirely, I think in my case as regional director, I would say, okay, how long do you want? But again, if I think it is not an abuse of discretion for the regional director to say, listen, I want to bring this thing to a close. I think at this point, employees, including Ms. Ratten, whose ballot was mailed 15 days ago, have had enough of a chance to have their voices heard. I want to finish this. All right. Thank you, council. I appreciate your time and the board will request that thank you. Thank you. Mr. Baskin, we'll give you two minutes. You have to work for a vote. I'll be brief. What we've heard today is a total lack of a coherent standard and nothing that was said today by the council actually appears in the board's decision. They were presented with the possibility of disenfranchisement standard cited to them and no mention of it. No mention that we're only treating it for one objection, not the other objection. We presented all five objections and the dissent understood that they should be considered collectively. The board just did not analyze it according to the way we've heard today or in the brief and it's all post hoc rationalizations for something that is just incoherent and cannot be approved by this court. As opposed to national hot rod, that decision is coherent and clear and most importantly has already been issued by a panel of this court, which other panels would follow. So we ask that you do the same and deny enforcement. Thank you. Thank you, council. Thank you to both council. We'll take this case under submission.
judges: Srinivasan, Henderson, Rogers